May it please the Court, Megan Coleman on behalf of the appellant Charles Galloway. Your Honors, this case is about a pro se defendant who, because of the Court's erroneous rulings, his prior counsel's ineffectiveness, and other circumstances beyond his control, was unable to receive and have a meaningful review of the electronic evidence in this case, therefore depriving him of his Sixth Amendment right to self-representation and to properly make a defense in his case. The government's case had 45 recordings of wiretapped phone calls that were introduced as evidence against Mr. Galloway in this case. These phone conversations spanned two months, but within the discovery, there were hundreds and hundreds of recorded calls to go through. In addition to the wiretapped evidence, there was also jail calls that had been recorded and some other electronic photo surveillance. The history of this case is important because it shows how Mr. Galloway was essentially pigeonholed into representing himself against the vast amount of electronic evidence that was in this case. Mr. Galloway was arrested in June of 2011, and from that time until the conclusion of his trial, spent his time up in the detention center in Baltimore. In July of 2011, private counsel entered her appearance, and from July of 2011 until November of 2011, she had not filed a single motion on Mr. Galloway's behalf except to adopt motions of co-defendants. In addition, she had only met with Mr. Galloway on two occasions and reviewed with him just a couple of the various electronic forms of evidence that would be introduced against Mr. Galloway. In December of 2011, Mr. Galloway, coming up upon what was now his third scheduled trial date, wrote to the district court indicating that he was concerned about going forward to trial because his private counsel had not maintained communication with him and shared the evidence with him. Mr. Galloway was brought in for a hearing on January 10, 2012, to determine whether or not he could go forward with private counsel as his attorney at trial. In that record, private counsel admitted that she had not sat down and reviewed with Mr. Galloway all of the evidence in this case. In fact, she admitted that she had only sat down with him on two occasions, one of which happened to be a reverse proffer, where the government was the one that shared some of the recorded evidence with Mr. Galloway. Are you suggesting she'd have to review all the evidence in a case with him? Well, I'm suggesting that... To be a competent counsel? I believe to be a competent counsel, number one, she has to review all of the evidence that is provided to her by the government. I believe that that would be due diligence. Well, I thought you made the point that she had to share it with him. Well, and number two, then, she has to share her review of the evidence with Mr. Galloway in some meaningful way. And I acknowledge that perhaps she does not need to sit down with him and listen to every single tape. I mean, could she listen to tapes and then go to him and tell him, I've listened to these tapes and they're pretty damaging. They've got you saying this and this and you've got one with Jones and this and this. I'm not sure we can oppose the tapes and just spend 10, 15 minutes talking in that fashion. Wouldn't that be enough? Well, Your Honor, she certainly could review the tapes and give her professional opinion to Mr. Galloway that in these tapes, it is my opinion that this is damning information and I may not have a great defense for you. I don't think that that is what the record demonstrates. All right, I was just questioning what you thought the responsibility of an attorney was. And it went a little further than I thought was what would be required. Go ahead. And I agree with you. I believe that a competent attorney could satisfy their requirements by reviewing all of the evidence that's given to them and making their professional opinion about what might occur if this case were to go forward at trial. But I believe Mr. Galloway's argument at the trial level and at the January 10, 2012 hearing is that he had not had that communication with his private counsel. She had not, other than saying we sat down at a reverse proffer and there was some damning evidence that the government played for us, his contention was she had not shared everything with him that she had reviewed. And in addition, there were various other requests that he had made of her that she had not followed through with. For example, she filed two motions to continue the trial date, which is in the record, and one of the motions, the reason for her request for a continuance, was because she said Mr. Galloway would like me to file additional motions in this case and therefore I need more time so that I may file those motions. Now, it doesn't say with specificity what those additional motions were, but certainly there was conversation between private counsel and Mr. Galloway that there was more that he wanted in terms of his defense. And even as your job as a defense attorney, in my opinion, is to give a reasonable review of the evidence, give your professional opinion, but ultimately it is the client whose liberty is at stake. And if he is requesting that you do more on his behalf, and if you then swear to the court in your motion to continue that you need that time so that you may do what your client is asking, but then you do nothing, I believe that that clearly demonstrates on the record an example of ineffectiveness. Now, former private counsel had the opportunity on January 10th to explain what she had done and to give her reasons. So contrary to what the government said in its response brief, this is not a case where former private counsel had no opportunity to explain her tactical decisions. She was asked some questions, Mr. Galloway made contentions, she acknowledged that she had read the letter that he sent to the court on December 31st, and yet she essentially remained silent. And when pressed further by the district court about whether she had done anything in terms of sitting down with him to prepare then for the actual trial since November 2011, her response to the court was, well, no, Your Honor, I haven't sat down with him because just recently the government has given me a tremendous amount of discovery. She made that statement on January 10th. The trial was set to begin approximately a week later, and the government at that motions hearing even responded, no, Your Honor, private counsel has had this discovery. We also have had an open-door policy, and the only discovery that has not yet been turned over to private counsel were the transcripts of the audio recordings that the government was going to use at trial, but private counsel had the actual recordings already in her possession. Could I ask you to turn your attention at some point to the expert testimony of Karras and Sokolowski? Yes, Your Honor. I will turn my attention to that, and I would just like to say in context of deciding what to do in this case, I think that all four of the issues that I cited in my brief are interrelated in terms of viewing the prejudice that Mr. Galloway suffered as a result of having to go forward under these circumstances. Now, review here is for plain error, because Galloway did not object below. He did fail to object, Your Honor, and let me start with a contention that I have with what the government cited in their response brief. It was only in my review of the record, again, it was only Detective Sokolowski who was asked questions, and he testified after Agent Karras. It was only Detective Sokolowski in his questioning by the government that had questions routinely prefaced to him with the phrase, in your expert opinion or expertise, and this is something that Wilson and Farmer and Baptiste indicated should be a procedural safeguard so that the jury can understand the clear line of demarcation between the fact and expert testimony. Now, so it is true, and it was a different government counsel that questioned Agent Sokolowski and perhaps was more attuned to what that safeguard would be, but when reviewing the testimony of Agent Karras, that was really where the government counsel that questioned him failed to keep those two areas distinct, and rather where the line was blurred between the expert and the factual testimony. And it's important to note that the government in their response brief said, well, there really was no prejudice because Mr. Galloway was able to vigorously cross-examine Detective Sokolowski. Well, Mr. Galloway did cross-examine Detective Sokolowski as to his interpretation of this coded language. However, if you review the record, Mr. Galloway only questioned Detective Karras for approximately two and a half pages of the record from Joint Appendix page 416 to 419, and he did not vigorously attack the detective's blurred testimony on direct examination. In addition, the other two witnesses who were co-defendants that testified against Mr. Galloway and also testified to these wiretapped phone calls, the challenge that Mr. Galloway lodged against them on cross-examination only went to whether or not they accepted a plea deal and therefore were getting some government by the benefit. He did not challenge their interpretation of the language that was used. So therefore, my point in bringing them into this argument is the jury heard the opinions of these two expert agents and the government in its response brief said, well, this was corroborated by Mr. Jones and Mr. Pia because they testified. Well, Mr. Galloway never. Yes, but what is your objection? My objection is that the safeguards were not enforced. The dual testimony safeguards? The dual testimony safeguards were not enforced in this case as they were in the Wilson case and others that followed. When Detective Karras was accepted, he was first accepted as an expert before he explained in the voir dire process what his methods were, what his experience was, and how he reliably applied his experience ultimately to the conclusions that he gave. When he testified, he simply said, he listened to the recording that was played for the jury, said, I believe that this is drug language and did not explain why. He did not explain that there were patterns within the tapes that he heard. For example, he testified that the use of the word credit card in one conversation was somehow related to drugs. He admitted that he had never before in all of his experience heard that phrase used in the context of a drug conversation. And he was not asked to explain, well, was there a pattern of the use of the word credit card in these conversations that you heard? And it was instances like that where he simply just listened to it and gave his opinion that, well, I believe that this is what the people speaking in these conversations intended when they said these words. And it was just left at that. Was he relying on context that they were only talking about narcotics and the narcotic situations and transactions that were being investigated? And, Your Honor, I believe that he only minimally explained that on a redirect examination. It was not something that he explained when he was being qualified as an expert. It was not something he explained when he went through the bulk of the tapes on direct or even on cross. It wasn't until the government counsel started to ask him questions that were blurring those lines that the district court, Suis Ponte, called the government up. Let me ask you this. If somebody testifies to a long and vast experience in listening to these tape recordings and says, I recognize coded language and this type of thing and says, I've qualified as an expert witness in this court, in a San Diego court, New Mexico court, California court, numerous times, I've been qualified as an expert in coded language, and then talks about all the teaching experience and so forth, isn't that enough to receive that person into evidence and allow the cross examination to develop whether he really has the skills? Well, I would say that Wilson says that it's not in the context of then also using that expert to be a fact witness in your case. Well, I thought we were talking about interpreting the term credit cards. Well, yes, your honor. I don't want to mix up our arguments here. The question you were raising is he had no basis for saying credit cards were narcotics. And it seems to me, the truth of the matter, we see these things all the time. And the people on the phone sort of make up anything that goes along. They know what they're talking about. They can be talking about televisions or cars or whatever. I'm going to deliver three cars to you on Friday or whatever. And they make it up as they go along. It's not a dictionary correlation. It's a contextual. It's a way to understand that they're covering up and trying to speak in a manner that won't be recognized by others. But it's pretty transparent. And experience probably helps. But I can tell you, I can know what they mean, too, reading them. And I'm not one of those experts. Yes, your honor. And certainly the jury will give that witness the weight that they think that they should based upon. How about the fact the witness has been qualified in this area several times? How do we take that? Well, I think that if somebody – I think that what courts hear is that somebody has continued to be qualified and therefore they're an expert. But if they go unchallenged as to their basis for qualification, as went unchallenged here, because Galloway did not do any voir dire, and he did not – may I just finish? My time is up. May I finish just answering this question? He did not challenge the detective on the voir dire, and he did not challenge him on cross with respect to these areas. And so I would say for this, to answer your question, just because the agent has been qualified before does not mean that the court should just automatically assume that his interpretation of what the facts are in this case. May the court take that into account in qualifying a witness? Certainly. And the real issue in this case – And because we're on plain error, may we rely on the fact that during redirect and cross-examination, the expert in this case explains the methodology of using context? You may – because this is plain error, you may rely on that in considering what to do with this issue. I would just submit that this issue goes beyond just whether or not he should have been qualified, but really should his testimony have been separated so that when he was giving these expert opinions, he wasn't also putting his stamp of approval on the facts as he was describing them? Well, he says – he testifies that I heard this telephone conversation. He authenticates the tape, and he says I heard them talking about transferring credit cards. That's a factual statement, right? It is a factual statement. Now the question is, do you require him to wait until later and go back and try to interpret all those words, or would you let him then say, officer, what did you take credit cards to mean based on your expert opinion? Could he do that? Well, I don't understand then why the court previously in Wilson established these safeguards to separate the fact and the expert testimony. I mean, they clearly said that the best way to do it is to have the witness come in, testify first as a fact witness, and then later testify as an expert witness. Thank you. Mr. Rahman. Thank you, Judge Traxler. My name is Sujit Rahman. I am the Appellate Chief for the District of Maryland, appearing on behalf of the United States. Mr. Rahman, could I go sort of – the biggest question I have, and if you would help me, please, I would really appreciate it. Wilson tells us, or in Wilson, we held that the court erred by admitting coded language testimony when the witness did not adequately explain the application of his methodology to a specific translation. Now here it appears that Sokolowski did do that. He explained how he applied what he usually does to deciphering this coded language. It does not appear to me, or I can't find any indication that that was done with respect to Mr. Karas, that he ever testified that he applied any procedures to identify and interpret coded languages here. And my question is just how does that square with Wilson? Your Honor, if I could direct your attention to page 513 of the Joint Appendix, and this is on the redirect examination of Special Agent Karas. And the question from the – the answer from Mr. Karas is sometimes they just use items to refer to drugs. It's all taken in the context of a conversation or an investigation, not standalone in the word itself. So he refers to context, which in this court's opinion in Wilson and in this court's opinion in Baptiste, which Your Honor authored, context is one of the principal modes of methodology. If an experienced agent, drug trafficking agent, sits down and listens to the phone calls, listens to the words in context, that is the application of his methodology to the facts of this case. You will acknowledge, I take it, that that is suboptimal. It would have been a lot clearer if on direct Mr. Karas had been a little more forthcoming and a little clearer in responding in my expert opinion. I think that's right. I think that's right, Your Honor. But you are aided by the fact that this is plain error. Yes, we are. Yes, we are. And we have – and I should say the district judge, I think, took great efforts. Judge Bennett was actually the judge who was affirmed in the Baptiste case, clearly making reference to Wilson, clearly making reference to Baptiste. Clearly giving cautionary instructions. That's right. Not only to the prosecutors in open court, but also specifically to the jury, where he in fact told the jury, look, folks, take these agents' opinions for what they're worth. You're welcome to give it whatever weight you'd like. And actually in open court advising the prosecutor, hey, make sure when you ask your questions, you clearly delineate between a factual question and an expert question. And in fact, that's exactly what the prosecutor then did, again, on redirect. What's the basis of that opinion, Special Agent Karas? And he says, my investigation into the organization here that delivered heroin to Baltimore, number one. Number two, my experience as a narcotics investigator. Number three, my experience in wiretaps. And number four, the context of all the calls. So here you do have an application, Judge Duncan, of the methodology, which is simply my vast experience as a drug trafficking narcotics agent, to the facts of this particular case. I would say that it perhaps was not done as clearly as it could have been, and I think we could have done it better. But I do think when you look at the totality of the circumstances under a plain error standard of review, there wasn't any error here. Certainly when you look at Detective Sokolowski's testimony, where it was very clearly delineated. It was very clear. And if I could, Your Honor, and I don't want to belabor the point. I'm sorry, somewhat cumulative. Yes, Your Honor. You answered my question. Thank you, Your Honor. And I'm happy to talk about the – I actually thought the discovery was sort of interesting, although it hasn't really been argued at length in the appellant's opening argument, so I won't spend too much time on it. I would just say that as far as the discovery issue goes, the access to the transcripts and the laptop, obviously we're here on an abuse of discretion standard of review, and I do think it's important to keep in mind what was going on in the background of this case. Mr. Galloway had private counsel for a substantial period of time. He chose to fire Ms. Flynn, or at least filed a letter with the district court at the very end of December 2011. The trial was scheduled for, I think, the second or third week of January 2012. He could have fired her any time he wished. He waited until the very last minute to try to fire her. At that point, the district court was left highly inconvenienced. It had to sever the trial for Mr. Sampson's trial. The Sampson trial went forward as originally scheduled. The district judge accommodated Mr. Galloway. He appointed the federal public defender. Mr. Galloway then fires the federal public defender just a few weeks before trial. And it's at that point that this discovery issue raises its head. The district court very promptly awarded access to the discovery, telling Mr. Galloway, look, I'm going to sign this order right now that the marshals will make a space available to you in the courthouse. And it's actually in the record, the courthouse was actually undergoing renovations at the time. And so there were issues about one of the rooms not having a plug for the laptop. Standby counsel, federal public defender, actually brought his own batteries, which allowed Mr. Galloway to review some of the discovery. It's important to note that Mr. Galloway spent many days at the detention facility. In fact, he chose not to come to the courthouse. That was his choice. So, and I should also say that all of these phone calls. Do you have any evidence that his batteries ran out while he was trying to review? I don't. Unable to review? I don't think that's in the records, Your Honor. I have not seen any reference to batteries running out. I have seen references to the standby counsel saying, I provided batteries, which had a limited lifespan. But I think the broader point here is that the paper transcripts, remember there was a trial in this case, the Samson case. The transcripts from those wiretap phone calls on my reading of the record were provided to Mr. Galloway in paper format. And, of course, it's his phone. So, I mean, he knows what's on the phone calls because they're his phone calls. So he's got the paper transcripts, as I understand it. What he doesn't have full access to, at least in terms of the battery life, is the actual playing of the tapes. Because each time he could have come over there, I mean, he could have come up with a recharged and with batteries. There's no evidence that he ran out and said, I need new batteries or I need more. I think that's fair. I didn't see that in the record. I think that's right, Judge Niemeyer. And I would say also that this laptop issue was raised for the first time only 10 days before trial. It's never raised again. The next time we hear about it is, I think, in his sentencing allocution when he was essentially pleading for mercy at that point. So, again, I don't want to belabor this discovery issue either. It seemed like an interesting issue to me at first when I first looked at this case. But as we sort of go through, certainly on plain error review, I think the district court had to balance safety concerns. Judge Bennett says this in the record. He has presided over two witness murder cases that arose out of the MCAC where a defendant made a phone call and ordered a hit from that facility. And that's something that trial court has to keep in mind in deciding whether or not to permit discovery to go back into the detention facility. So he said, look, you can have full access to this stuff, but it's got to be within the marshal's lockup. And he made that space available to him. Mr. Galloway chose not to afford himself with that opportunity except on a handful of occasions, and that's his choice. So, again, I don't want to go on and on on that issue. We don't believe that there was any abusive discretion on the judge's part as far as the discovery issue goes. Your Honor, if I have answered your questions about the expert testimony. And I know there are two other issues, Your Honors. Again, I don't want to belabor my time in front of the court. It seems to us that the ineffective assistance claim really should be, if at all, it should be addressed. The most appropriate place is in a 2255. The record is not clear. In fact, Ms. Flynn, there's a factual dispute. Ms. Flynn says that she spoke with Mr. Galloway about the case. Mr. Galloway claims that she never did. That in itself is a factual dispute that it seems to us is best addressed. Well, you have the problem, too, and it's difficult in this record for us to assess at this time when he's given authority to fire his counsel and get second counsel and given authority to fire that counsel. He is in a situation where it's hard to complain about the first counsel. I think that's right. I mean, he has to really show that that first counsel shaped his whole defense and he could not recover from it with second counsel or by himself. And, of course, she did file motions to adopt the motions of all the other defendants. So the key suppression issue was litigated. All the other key pretrial motions were litigated in this case by proxy. So it's hard for us to see where the prejudice is to the defendant to the extent that all the key issues that would have been litigated were litigated, including, and that's the fourth point, the suppression of the wiretap. Again, I won't belabor this point. It seems to us the exhaustion requirement was clearly satisfied here. It's a very lengthy affidavit. I think it's 69 pages that was provided that shows all the different steps that the investigating agents took. And the court is very well aware wiretap investigations are commonplace in these complex, incredibly complicated drug trafficking conspiracies, especially one like this one, which spanned both sides of the continent of the United States, involved points in New York and Baltimore and San Diego, involving shipments of drugs coming in from abroad. This is a prototypic wiretap case. And it seems to us that there was certainly no abusive discretion on the district court's part in permitting that wiretap testimony to be presented. If there are no further questions, Your Honors, I am happy to submit with that. Thank you, Your Honors. Thank you. Ms. Goldman, reply. Thank you. If I may use my remaining time to address the discovery issue that I started and that Mr. Rahman picked up on, it was not one week prior to trial that Mr. Galloway first made this complaint about not having the laptop. It was actually on January 23rd, a couple of weeks after private counsel had been discharged, that Mr. Galloway wrote to the court and to the public defender detailing his request for a laptop to review the information. That letter, though not docketed, was referred to in the joint appendix on page 328 in a subsequent February 7th letter. What's the point you're making? The point that I'm making is that he did not wait until right before trial to request this evidence to review. When he had private counsel, he was trying to get... You're talking about now the transcript, the actual tape. The actual tape recordings, correct. And he had transcripts of that. I disagree that the record is clear that he was provided with the transcripts. I don't have a citation from the joint appendix that Mr. Galloway was in receipt of the transcripts that the government created. Did the district court order the discovery be provided to Mr. Galloway? The district court ordered that Mr. Galloway have a... No, I asked you a question whether the district court ordered that the discovery be provided to Mr. Galloway. I don't recall that there was an order explicitly saying that because what occurred was after private counsel was exited from the case and the public defender stepped in, I think it was assumed that the public defender would then review with Mr. Galloway any of the discovery. Did the district judge enter some order directing that discovery be provided to Mr. Galloway? Yes, at the marshal's lockup, correct. And the issue was that... I'm talking about broader discovery. I mean, I'm trying to suggest that he was provided with the transcripts. I think that it was on January 10th at the hearing to discharge private counsel that after that in-camera hearing happened and the government was brought back into the courtroom, the district court said, government counsel, from this in-camera hearing, it appears that there are claims that the discovery hasn't been turned over. The discovery all needs to be turned over. And it was at that time the government counsel said, no, your honor, the discovery has all been turned over. The only thing outstanding are the government transcripts, which we are... Then he did get the transcripts. The transcripts, the only things that are outstanding are the transcripts, which we anticipate will be provided in the next week or so, because at that point the trial was supposed to start in a week. Then after that discussion about the outstanding transcripts, that's when the whole motion to sever came up and eventually the case was severed and the trial was continued until March 19th. Are you saying there's no evidence whether he got the transcripts? Yes, that is what I... Or is there evidence that he didn't get them? I am saying that there is no evidence whether he did or did not. And so, but what we know is that as of January 23rd, he had not received the wiretap tapes because he wrote both to counsel and to the court, and that is reflected in page 328 of the joint appendix. And then about one week later on February 7th, the public defender again writes to the court requesting a laptop, and also in that letter indicates, your honor, I was just appointed. I don't even have time to go over all of this discovery. And by the way, former private counsel, though she's been gracious about giving me all of the contents of discovery that she had, continues to find pieces of discovery in her office that she has not yet turned over to me. Again, on February 15th, when the parties were brought in then for the hearing where the public defender was discharged, the public defender again makes the request for a laptop to be brought over for Mr. Galloway's review of the recordings. If there is nothing indicating that any transcripts had been received or turned over, and at this... He was rejected to not receiving them, did he? You never said, I haven't received them. No, I don't think the record shows to the actual... He was rejected only to the arrangement for having the laptop at the detention house. And to being able to review the recordings with the laptop, correct. And he was given that authority. He wanted to do it back at the detention center. Yes, Your Honor, but my... Isn't that the whole issue? Well, that's not the whole... I think the issue is more whether he had a meaningful opportunity to review the evidence, period. Not whether it was at the court or whether it was at... Other aspects. He complained about being provided a laptop at the courthouse instead of in the detention center. What other thing did he object to, specifically object to about discovery? Well, he wanted... Your Honor, I will submit that I cannot point to another specific with respect to discovery. Well, the issue, if I may, thank you, is that he was denied an opportunity to review the wiretapped evidence, which was the bulk of the government's case. And whether he had the laptop at the detention center or the courthouse in the Marshalls lockup, it doesn't matter. He never had that laptop until February 29th, which was just a couple of weeks before the trial. Yeah, but he had access. He could come over to do that every day, and he didn't. He was not even brought to the lockup until February 27th. That was over two weeks after the public defender was discharged and a month and a half since the public defender was discharged. So even though the court said, we'll get back to you, we'll put an order in place, he was not first brought to the courthouse to review any discovery until February 27th, and there still was no laptop for him until March 1st, because February 29th was when the court actually signed the order for the laptop. And I think that answered your question, and I'm out of time. So thank you very much. Thank you, Ms. Goldman. I note that you're court appointed. We appreciate very much your undertaking representation for Mr. Galloway. All right, I'll ask the clerk to adjourn court, and then we'll come down and agree counsel. This honorable court stays adjourned until tomorrow morning at 8.30. God save the United States and this honorable court.
judges: William B. Traxler, Jr., Paul V. Niemeyer, Allyson K. Duncan